UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| STEPHEN BUSHANSKY, on Behalf of Himself and All Others Similarly Situated, | § § § | CIVIL ACTION NO. 4:12-cv-02257 |
| Plaintiff, | § § | |
| v. | § § | |
| GENON ENERGY, INC., EDWARD R. MULLER, E. SPENCER ABRAHAM, TERRY G. DALLAS, THOMAS H. JOHNSON, STEVEN L. MILLER, ELIZABETH A. MOLER, ROBERT C. MURRAY, LAREE E. PEREZ, EVAN J. SILVERSTEIN, WILLIAM L. THACKER, NRG ENERGY, INC., and PLUS MERGER CORPORATION, | § § § § § § § § § § § | |
| Defendants. | § | |

**FIRST AMENDED COMPLAINT FOR VIOLATIONS OF § 14(a) AND § 20(a)
OF THE SECURITIES EXCHANGE ACT OF 1934 AND RULE 14a-9
OF THE U.S. SECURITIES AND EXCHANGE COMMISSION
PROMULGATED THEREUNDER AND FOR
<u>BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING</u>**

## PRELIMINARY STATEMENT

1.      This is a shareholder class action brought by Plaintiff Stephen Bushansky ("Plaintiff") on behalf of himself and all other public shareholders of GenOn Energy, Inc. ("GenOn" or the "Company"), against the Company, GenOn's board of directors (collectively, as identified below, the "Board" or the "Individual Defendants"), and NRG Energy, Inc. ("NRG"), and its wholly owned subsidiary Plus Merger Corporation ("Merger Sub"), in connection with the proposed acquisition of the Company by NRG (the "Proposed Transaction"). Plaintiff seeks equitable relief for the Board's breaches of fiduciary duties arising out of their ongoing efforts to sell the Company to NRG for inadequate consideration, via a non-existent sales process, and through a materially misleading registration statement.  Additionally, Plaintiff, individually, brings a claim against Defendants for their violations of Sections 14(a) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and U.S. Securities and Exchange Commission ("SEC") Rule 14a-9 promulgated thereunder ("Rule 14a-9").

2.      On July 20, 2012, GenOn, NRG, and Merger Sub, entered into a definitive Agreement and Plan of Merger (the "Merger Agreement") pursuant to which NRG would acquire GenOn in an all-stock deal with a total value of approximately $1.7 billion.  Under the terms of the Merger Agreement, for each share of GenOn common stock, shareholders will receive 0.1216 of a share of NRG common stock (the "Exchange Ratio").  Defendants expect to close the Proposed Transaction during the first quarter of 2013.

3.      As described below, the Proposed Transaction is patently opportunistic and does not reflect the intrinsic value of GenOn as a takeover candidate, particularly in light of its position as one of the United States' largest competitive generators of wholesale electricity.

4.     The Company is poised for continued long-term growth, having recently successfully completed the integration of Mirant Corporation ("Mirant") and RRI Energy, Inc. ("RRI"), whose merger formed GenOn in December 2010.

5.     The Proposed Transaction was driven by GenOn's management, particularly its Chairman, President, and Chief Executive Officer ("CEO"), Edward R. Muller ("Muller"), who had attempted to acquire NRG in 2006 when he headed GenOn's predecessor, Mirant.

6.     As discussed below, the Individual Defendants failed to exercise their fiduciary duties and entered into the Merger Agreement prior to conducting an adequate sales process or engaging in any kind of market check.  Additionally, the Board failed to ever consider forming a special committee comprised of independent directors to explore potential strategic transactions, including the sale of the Company.  Indeed, the Board entirely abdicated its role in the sales process and rubber stamped Muller's decision to work out a deal exclusively with NRG without considering any other potential buyers.

7.     Rather than act in the best interest of the Company's shareholders, the Individual Defendants unanimously approved the Merger Agreement and entered into the Proposed Transaction in order to secure significant benefits for themselves and other key Company insiders at the expense of the Company's public shareholders.

8.     GenOn's Board and management were incentivized to capitalize on a sale to NRG over any other potential buyers or strategic options because insiders were able to secure opportunities in the post-merger entity.  Indeed, Muller and his fellow insiders engaged in self-serving negotiations concerning their respective futures at the combined entity from at least June 26, 2012, onward, well before GenOn had concluded negotiations concerning the principal terms of a sales agreement with NRG.  Indeed, on July 11, 2012, the parties expressly agreed that

after the consummation of the Proposed Transaction, four out of the ten directors currently sitting on the Board would be appointed to the enlarged post-merger NRG board of directors, including the appointment of Muller as its Vice Chairman.  In addition, the parties agreed that, at the closing of the Proposed Transaction, NRG would appoint GenOn's Senior Vice President of Asset Management, Anne M. Cleary ("Cleary"), as its Chief Integration Officer, and GenOn's Senior Vice President and Chief Commercial Officer, Robert J. Gaudette ("Gaudette"), as its Senior Vice President, Product Development and Origination.

9.     In addition, GenOn's directors and officers hold millions of dollars in Company stock options and restricted stock units ("RSUs") that will accelerate and vest solely by reason of the closing of the Proposed Transaction (the "Single-Trigger Accelerated Interests").  Muller's Single-Trigger Accelerated Interests are valued at approximately $1.4 million based upon the assumption that the fair market value of NRG stock at the time of conversion will equal $19.33 per share (however, these interests will likely be valued much higher as NRG stock has consistently been trading above $20.00 per share since August 10, 2012 – hitting a recent post-deal announcement high of $22.92 per share on August 21, 2012).

10.    Certain officers of the Company, including Muller, will also be entitled to additional accelerated vesting of options and RSUs upon qualifying termination of employment within two years following the consummation of the Proposed Transaction (the "Double-Trigger Accelerated Interests").  Muller's Double-Trigger Accelerated Interests are valued at approximately $2.4 million based upon the assumption that, at the time of conversion, the fair market value of NRG stock will equal $19.33 per share (but the value of these interests is likely to be much higher in light of the recent trading price of NRG stock).

11.     Further, GenOn officers will also be entitled to certain change-in-control benefits either under their respective employment agreements or the GenOn Change-in-Control Severance Plan.  Notably, Muller may receive benefits worth over $15 million in total as "golden parachute" compensation, notwithstanding his appointment as the Vice Chairman of the post-merger NRG.

12.     Despite failing to conduct any kind of sales process or market check, the Board acceded to NRG's demands to ensure that no other potential bidders would emerge to top NRG's offer and locked up the deal with onerous deal protection devices that effectively eliminate any potential auction process, including: (i) a "no solicitation" provision barring the Board and any Company personnel from attempting to procure a price in excess of the amount offered by NRG; (ii) a requirement that the Company provide NRG with written notice within 24 hours of its receipt of an unsolicited offer from another party, (iii) a "last-look" provision allowing NRG four business days to top any superior proposal made by another potential acquirer; and (iv) imposition of an exorbitant termination fee of $60 million on GenOn payable to NRG in certain circumstances, including if the GenOn Board terminates the Merger Agreement or changes its recommendation to shareholders in order to pursue an alternative superior proposal.

13.     In an effort to secure shareholder support for the unfair Proposed Transaction, GenOn and NRG filed a preliminary Form S-4 Registration Statement and joint proxy/prospectus (the "Preliminary Proxy") with the SEC on August 15, 2012.  The Preliminary Proxy outlines the Proposed Transaction, and recommends that the public shareholders of GenOn vote in favor of the Proposed Transaction and approve the Merger Agreement, in breach of the Individual Defendants' fiduciary duties to the Company's shareholders both with respect to price and process.

14.     The Preliminary Proxy misstates and/or omits material information regarding, *inter alia*, the Proposed Transaction, the process leading up to the Merger Agreement (including the Board's consideration and pursuit of various strategic alternatives and other possible buyers) and key inputs and underlying assumptions relied upon by GenOn's financial advisor, J.P. Morgan Securities LLC ("JP Morgan"), as well as NRG's financial advisors, Credit Suisse Securities (USA) LLC ("Credit Suisse") and Morgan Stanley & Co. LLC ("Morgan Stanley"), in performing their respective financial and valuation analyses of the Company.   Defendants have violated Sections 14(a) and 20(a) of the Exchange Act and Rule 14a-9 promulgated thereunder, by omitting material facts necessary to render the Preliminary Proxy non-misleading. Defendants have also breached their fiduciary duty of candor by failing to disclose material information concerning the Proposed Transaction.   As a result of the materially misleading Preliminary Proxy, Plaintiff and GenOn's other public shareholders have been stripped of their ability to render an informed decision as to whether to vote their shares in favor of the Proposed Transaction.

15.     As a result of the nonexistent, thus inherently flawed, sales process and the coercive deal protection devices, the Proposed transaction is a *fait accompli*, and absent intervention of the Court, the Company's minority shareholders will have no say in this contest for corporate control.

16.     The Individual Defendants' conduct constitutes a breach of their fiduciary duties of loyalty, due care, independence, good faith and fair dealing owed to Plaintiff and GenOn's public shareholders, and a violation of applicable legal standards governing their conduct.   As set forth herein, Plaintiff seeks to enjoin Defendants from pursuing the Proposed Transaction or, in

the event the Proposed Transaction is consummated, recover damages resulting from Defendants' wrongful conduct.

## JURISDICTION AND VENUE

17.     This Court has subject matter jurisdiction over all claims pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1331.  The claims asserted herein arise under Sections 14(a) and 20(a) of the Exchange Act, 15 U.S.C. § 78n(a) and Rule 14a-9 promulgated thereunder, as well as under Delaware common law.  The court has jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367.

18.     In addition, this Court has subject matter jurisdiction pursuant to diversity of the parties.  Every issue of law and fact in this action is wholly between citizens of different states. Plaintiff is, and was at all times hereinafter mentioned, domiciled in, and a citizen of, the state of New York.

19.     GenOn is a corporation duly organized, incorporated and existing under the laws of the state of Delaware and its principle place of business is in Houston, Texas.  None of the Individual Defendants (identified below) are citizens of the state of New York.  Defendant NRG was, and is now, a corporation duly organized, incorporated and existing under the laws of the state of Delaware and its principle place of business is in Princeton, New Jersey.  Defendant Merger Sub is a corporation duly organized, incorporated and existing under the laws of the state of Delaware and is a wholly owned subsidiary of NRG.

20.     Plaintiff sues for damages in excess of $75,000 (exclusive of interest, fees and costs).

21.     Venue is proper in this District because many of the acts and practices complained of herein occurred in substantial part in this District, including the dissemination of

6

the materially misleading statements and omissions alleged herein.  Defendant GenOn was, and is now, headquartered in Houston, Texas.

## THE PARTIES

22.     Plaintiff Stephen Bushansky, a domicile of the State of New York, is, and has been at all relevant times hereto, the owner of shares of the common stock of GenOn.

23.     GenOn, a Delaware corporation, is a leading independent power producer in the United States.  The Company has approximately 23,700 megawatts ("MW") of net electric generating capacity located near several major metropolitan load centers throughout the United States.  GenOn's corporate headquarters is located at 1000 Main Street, Houston, Texas.  GenOn was formed in December 2010 through the merger of Mirant and RRI.  Since its formation, its common stock has traded on the New York Stock Exchange ("NYSE") under the symbol "GEN."

24.     Defendant NRG, a Delaware corporation and Fortune 500 company, is an integrated wholesale power generation and retail electricity company with three business sectors: (i) its wholesale power generator is engaged in the ownership and operation of power generation facilities; the trading of energy, capacity and related products; and the transacting in and trading of fuel and transportation services; (ii) its retail electricity business is engaged in the supply of electricity, energy services, and cleaner energy products to retail electricity customers in deregulated markets through Reliant Energy, Green Mountain Energy, and Energy Plus; and (iii) its alternative energy sector invests in and develops new technologies that NRG believes will bring significant commercial opportunities.  Its corporate headquarters is located at 211 Carnegie Center, Princeton, New Jersey.  Its common stock is traded on the NYSE under the symbol "NRG."  All references herein to "NRG" also include Defendant Merger Sub.

25.      Defendant Merger Sub, a Delaware corporation, is a wholly-owned subsidiary of NRG and a party to the Merger Agreement.

26.      Defendant Muller, a domicile of the State of Texas, is and has been GenOn's Chairman, President, and Chief Executive Officer ("CEO") since December 2010.  Prior to this, Muller served as chairman, president, and CEO of Mirant since 2000.  According to the Preliminary Proxy, Muller holds 4,101,102 exercisable options, which will be worth millions upon the consummation of the Proposed Transaction.  In addition, he holds 496,428 options and 597,984 RSUs, which are subject to accelerated vesting upon the completion of the Proposed Transaction.  Further, he will be entitled to receive "golden parachute" compensation valued at approximately $15.4 million, according to the Preliminary Proxy, which include an additional 1,166,823 options and 1,023,362 RSUs subject to accelerated vesting, if his employment is terminated within two years following the completion of the Proposed Transaction – notwithstanding his appointment as Vice Chairman of the post-merger NRG Board.

27.      Defendant E. Spencer Abraham ("Abraham"), a domicile of the Commonwealth of Virginia, has served on the GenOn Board since January 2012.

28.      Defendant Terry G. Dallas ("Dallas"), a domicile of the State of California, has served on the GenOn Board since December 2010.  He serves as a member of the Board's Audit Committee and Risk and Finance Oversight Committee.

29.      Defendant Thomas H. Johnson ("Johnson"), a domicile of the State of Georgia, has served on the GenOn Board since December 2010.  He serves as a member of the Board's Compensation Committee and Risk and Finance Oversight Committee.

30.     Defendant Steven L. Miller ("Miller"), a domicile of the State of Texas, has served on the GenOn Board since August 2003.  He serves as Chairperson of the Board's Nominating and Governance Committee, and is a member of the Compensation Committee.

31.     Defendant Elizabeth A. Moler ("Moler"), a domicile of the Commonwealth of Virginia, has served on the GenOn Board since January 2012.

32.     Defendant Robert C. Murray ("Murray"), a domicile of the State of Rhode Island, has served on the GenOn Board since December 2010.  He serves as Chairperson of the Board's Audit Committee, and is a member of the Nominating and Governance Committee.  Murray had previously served on Mirant's board of directors since 2006.

33.     Defendant Laree E. Perez ("Perez"), a domicile of the State of New Mexico, has served on the GenOn Board since April 2002.  She serves as a member of the Board's Audit Committee and Risk and Finance Oversight Committee.

34.     Defendant Evan J. Silverstein ("Silverstein"), a domicile of the State of Florida, has served on the GenOn Board since August 2006.  He serves as Chairperson of the Board's Risk and Finance Oversight Committee, and is a member of the Audit Committee.

35.     Defendant William L. Thacker ("Thacker"), a domicile of the State of Texas, has served on the GenOn Board since December 2010.  He serves as Chairperson of the Board's Compensation Committee.

36.     Defendants Muller, Abraham, Dallas, Johnson, Miller, Moler, Murray, Perez, Silverstein, and Thacker are collectively referred to herein as the "Individual Defendants" or the "Board," which, together with GenOn and NRG are collectively referred to herein as "Defendants."

## CLASS ACTION ALLEGATIONS

37.     Plaintiff brings this action individually and on behalf of all owners of the common stock of GenOn, and their successors in interest, who have been and will be harmed by the wrongful conduct of Defendants as alleged herein (the "Class").  The Class excludes Defendants and any person, firm, trust, corporation or other entity related to, affiliated with, or controlled by any of the Defendants, as well as the immediate families of the Individual Defendants.

38.     This action is properly maintainable as a class action.

39.     The Class is so numerous that joinder of all members is impracticable.  According to the Preliminary Proxy, as of August 10, 2012, the total number of issued and outstanding shares of GenOn common stock was approximately 772.9 million.  Members of the Class are scattered throughout the United States and are so numerous that it is impracticable to bring them all before this Court.

40.     Questions of law and fact exist that are common to the Class and predominate over questions affecting any individual Class member, including, among others:

(a)     whether the Individual Defendants have fulfilled and are capable of fulfilling their fiduciary duties owed to Plaintiff and the Class, including, but not limited to, the duties of undivided loyalty, independence, due care, honesty, good faith, diligence, candor, and fair dealing;

(b)     whether the Individual Defendants have breached their fiduciary duty to secure and obtain the best price reasonable under the circumstances for the benefit of Plaintiff and other Class members;

(c)     whether Plaintiff and the other members of the Class will be irreparably damaged if Defendants are not enjoined from continuing the conduct described herein, or alternatively, whether they have suffered compensable damages;

(d)     whether the Individual Defendants are engaging in self-dealing in connection with the Proposed Transaction;

(e)     whether the Individual Defendants are unjustly enriching themselves and other insiders or affiliates of GenOn;

(f)     whether the Individual Defendants, in bad faith or for improper motives, have impeded or erected barriers to discourage other offers for the Company or its assets;

(g)     whether Defendants aided and abetted the Individual Defendants' breaches of fiduciary duties, including, but not limited to, undivided loyalty, independence, due care, honesty, good faith, diligence, candor, and fair dealing with respect to Plaintiff and the Class as a result of the conduct alleged herein;

(h)     whether Defendants have failed to provide all material information to shareholders in connection with the Proposed Transaction;

(i)     whether the consideration payable to Plaintiff and the Class under the Proposed Transaction is unfair and inadequate; and

(j)     whether Plaintiff and the Class are entitled to injunctive relief, damages, or other relief.

41.     Plaintiff is committed to prosecuting this action and has retained competent counsel experienced in litigation of this nature.  Plaintiff's claims are typical of the claims of the other members of the Class and Plaintiff has the same interests as the other members of the

Class.  Accordingly, Plaintiff is an adequate representative of the Class and will fairly and adequately protect the interests of the Class.

42.     The prosecution of separate actions by individual members of the Class would create the risk of inconsistent or varying adjudications with respect to individual members of the Class, which would establish incompatible standards of conduct for Defendants, or adjudications with respect to individual members of the Class which would, as a practical matter, be dispositive of the interests of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interests.

43.     Preliminary and final injunctive relief on behalf of the Class as a whole is entirely appropriate because Defendants have acted, or refused to act, on grounds generally applicable and causing injury to the Class.

## THE FIDUCIARY DUTIES OF INDIVIDUAL DEFENDANTS

44.     By reason of the Individual Defendants' positions with the Company as officers and/or directors, they are in a fiduciary relationship with Plaintiff and the other public shareholders of GenOn and owe them unwavering duties of good faith, fair dealing, undivided loyalty, and full and candid disclosure.

45.     In a situation where the directors of a publicly traded company undertake a transaction that may result in a change in corporate control, a break-up of the corporation's assets, or a sale of the company, the directors must take all steps to obtain the highest value reasonably available for the corporation's shareholders, and disclose all material information concerning the proposed transaction to enable the shareholders to make an informed voting decision.  To diligently comply with this duty, as directors of GenOn, the Individual Defendants have fiduciary obligations to:

(a)     undertake an appropriate evaluation of GenOn's net worth as a merger/acquisition candidate;

(b)     act independently to protect the interests of the Company's public shareholders;

(c)     adequately ensure that no conflicts of interest exist between the Individual Defendants' own interests and their fiduciary obligations, and, if such conflicts exist, to ensure that all conflicts are resolved in the best interests of GenOn's public shareholders; and

(d)     actively evaluate the Proposed Transaction and engage in a meaningful auction with third parties in an attempt to obtain the best value on any sale of GenOn.

46.     Likewise, when undertaking a change of control, break-up, or sales transaction, the Independent Directors may not take any action that:

(a)     adversely affects the value provided to the corporation's shareholders;

(b)     contractually prohibits them from complying with or carrying out their fiduciary duties;

(c)     discourages or inhibits alternative offers to purchase control of the corporation or its assets; or

(d)     will otherwise adversely affect their duty to search for and secure the best value reasonably available under the circumstances for the corporation's shareholders.

47.     Plaintiff alleges herein that the Individual Defendants, separately and together, in connection with the Proposed Transaction, violated their duties owed to Plaintiff and the other public shareholders of GenOn and have failed to provide shareholders with all information necessary to make an informed decision in connection with the Proposed Transaction.   As a

result of the Individual Defendants' divided loyalties, neither Plaintiff nor the Class will receive adequate or fair value for their GenOn common stock in the Proposed Transaction.

48.     Because the Individual Defendants are knowingly or recklessly breaching their duties of loyalty, good faith, and independence in connection with the Proposed Transaction, the burden of proving the inherent or entire fairness of the Proposed Transaction, including all aspects of its negotiation, structure, price and terms, is placed upon Defendants, as a matter of law.

### CONSPIRACY, AIDING AND ABBETTING, AND CONCERTED ACTION

49.     In committing the wrongful acts alleged herein, Defendants have pursued, or joined in the pursuit of, a common course of conduct, and acted in concert with and conspired with one another, in furtherance of their common plan or design.  In addition to the wrongful conduct herein alleged as giving rise to primary liability, Defendants further aided and abetted and/or assisted each other in breach of their respective duties as herein alleged.

50.     Each Defendant herein aided and abetted and rendered substantial assistance in the wrongs complained of herein.  In taking such actions as particularized herein, to substantially assist the commission of the wrongdoing complained of, each Defendant acted with knowledge of the primary wrongdoing, substantially assisted the accomplishment of that wrongdoing, and was aware of his or her overall contribution to, and furtherance of, the wrongdoing.  Defendants' acts of aiding and abetting, included the acts each of them are alleged to have committed in furtherance of the conspiracy, common enterprise and common course of conduct complained of herein.

## SUBSTANTIVE ALLEGATIONS

### GenOn's Prospects for Long-Term Growth Are Excellent

51.     The Proposed Transaction does not reflect the value of GenOn's financial strength in the price being paid to its shareholders.  The Company's long-term prospects are good and it is positioned for future growth.

52.     According to GenOn's February 29, 2012 press release reporting the results of its fiscal year ended on December 31, 2011, since the Company's formation through a merger of Mirant and RRI in December 2010, it has successfully integrated and achieved $160 million in annual cost savings.

53.     In its May 10, 2012 press release reporting GenOn's results for its 2012 first quarter ended March 31, 2012, the Company raised its adjusted EBITDA guidance from $440 million to $446 million for 2012, and from $665 million to $669 million for 2013.   At the earnings conference call held on May 10, 2012, Muller noted that, according to one of the key metrics used by the Company to judge its performance, the Total Margin Capture Factor ("TMCF"), which measures the percentage earned of the gross margin that could have been earned, GenOn achieved a "TMCF of 93% in the first quarter, which is very good."  Muller also pointed out that the Company's safety performance and environmental performance were "very good" – suffering few OSHA reportable incidents and few environmental incidents, particularly as compared with industry statistics.

54.     However, GenOn stock has recently been experiencing a downward trend, plummeting approximately 56% from its pre-deal 52-week high of $4.10 per share on July 26, 2012, to a closing price of $1.82 per share on July 20, 2012, the pre-announcement trading day. Rather than permit the stock to recover and GenOn shareholders to gain from the long-term prospects, the Individual Defendants have approved a deal that provides NRG with an

opportunity to benefit from the successful integration of the Company's December 2010 merger but does not provide GenOn shareholders with adequate consideration.

### The Insufficient Sales Process

55.     GenOn and NRG, through their predecessors, have a long history.  For example, in 2006, Defendant Muller led Mirant, GenOn's predecessor, in making an unsuccessful hostile takeover bid to buy NRG for $7.9 billion.  Later, in May 2009, NRG acquired its Texas retail electricity business from GenOn's predecessor, Reliant Energy.

56.     Given this long history, GenOn's Board and management favored a deal with NRG from the outset.  Without informing GenOn shareholders as to whether any efforts were made to assess the qualifications of other potential partners for a business combination or the Board's rationale for determining to focus exclusively on accomplishing a deal with NRG, the Preliminary Proxy states that "[b]y March 2012, a potential business combination with NRG was viewed as the most realistic business combination transaction that was achievable consistent with the criteria discussed by the GenOn Board."

57.     On April 13, 2012, Defendant Muller telephoned NRG's President and CEO, David Crane ("Crane"), to indicate GenOn's interest in exploring a potential business combination between the two companies.  The two agreed to meet in mid-May.

58.     According to the Preliminary Proxy, following the April 13th conversation, "the management of each of NRG and GenOn conducted reviews of the business and financial condition of the other company based on . . . publicly available information regarding the other company."   In addition, GenOn retained Skadden, Arps, Slate, Meagher & Flom LLP ("Skadden") as its legal advisor in connection with a potential transaction with NRG.

59.     The Board's input in this deal was minimal.  Indeed, Defendant Muller waited until April 25, 2012, nearly two weeks after his conversation with NRG, to inform GenOn's lead director Miller of that conversation and of the planned meeting with Crane set for May 15, 2012. Additionally, Defendant Muller waited another two weeks, until the May 9, 2012 Board meeting, to inform the full GenOn Board, of what was discussed on April 13th and the meeting with NRG scheduled for mid-May.

60.     On May 15, 2012, representatives from the management of GenOn and NRG met to discuss the strategic rationale for a potential business combination between the two companies and potential synergies that might be derived.  The parties decided to enter into a confidentiality agreement and exchange certain nonpublic financial information as part of an initial phase of due diligence, which would primarily focus on confirming potential synergies of a business combination and assessing the relative value of the two companies.

61.     On May 22, 2012, NRG and GenOn entered into a mutual confidentiality agreement that contained a customary standstill provision.  Thereafter, the two companies conducted due diligence of each other, which included several meetings in June 2012 where the two exchanged financial information and engaged in "extensive discussions regarding anticipated synergies, treatment of existing debt, integration matters and other aspects of the potential transaction."

62.     On June 18, 2012, nearly two months after Defendant Muller contacted Crane to discuss a possible combination, GenOn retained JP Morgan as its financial advisor in connection with the proposed transaction.  Also, on June 29, 2012, GenOn retained Talisman International ("Talisman"), a nuclear consulting firm, to assist in due diligence with respect to NRG's ownership in a two reactor unit nuclear generating facility (a.k.a. the "South Texas Project").

63.     On June 19, 2012, representatives of NRG and GenOn met and discussed, *inter alia*, for the first time, their respective views on valuation and potential governance structures for the combined company.

64.     At the June 21, 2012 special meeting of the Board, the Board discussed the status of discussions with NRG with senior management and, *inter alia*, approved the engagement of JP Morgan as GenOn's financial advisor.

65.     Beginning on or about June 25, 2012, GenOn and NRG conducted a more in-depth business, financial, and legal due diligence, with each party providing the other with access to non-public information regarding their respective businesses.  In addition, the parties and their respective legal advisors engaged in a series of negotiations concerning the terms of the merger agreement.

66.     On June 26, 2012, representatives of NRG and GenOn discussed the potential structure and composition of the board of directors of the combined company, including the possibility that Defendant Muller would serve as its vice chairman.

67.     On July 11, 2012, before concluding negotiations as to the principal terms of the merger agreement, including the exchange ratio, the parties agreed that following the consummation of the merger, the NRG board would be composed of 16 directors, consisting of 12 NRG directors and four GenOn directors, including Defendant Muller who would be appointed as vice chairman.  The parties further agreed to wait until after the execution of the definitive merger agreement to determine the specific GenOn directors who would join the post-merger NRG board.

68.     On July 13, 2012, GenOn and NRG agreed that the exchange ratio would be determined based on the average closing prices of NRG stock and GenOn stock during the 10 and 20 trading day period ending July 18, 2012.

69.     On July 18, 2012, Crane and Muller agreed to seek the approval of their respective boards based on an exchange ratio of 0.1216.

70.     Also on July 18, 2012, members of GenOn's and NRG's respective management further discussed the structure and composition of the board of directors of the combined company.

71.     On July 20, 2012, after discussing the Proposed Transaction with its advisors, including considering JP Morgan's fairness opinion, the GenOn Board unanimously approved the Merger Agreement and the transactions contemplated therein.  The NRG Board approved the Merger Agreement on the same day.

### The Proposed Transaction and Merger Consideration Is Inadequate and Unfair

72.     On July 20, 2012, following the approvals by the Board and the NRG Board, the parties executed the Merger Agreement after the market closed.  Pursuant to the Merger Agreement, NRG will acquire all of the outstanding shares of GenOn in a deal with a total value of approximately $1.7 billion.  Under the terms of the Merger Agreement, GenOn shareholders will receive 0.1216 shares of NRG common stock in exchange for each GenOn share of common stock.

73.     Upon the consummation of the Proposed Transaction, Merger Sub will merge with and into GenOn, at which time the separate corporate existence of Merger Sub will terminate, with GenOn surviving and continuing its corporate existence under Delaware law as a direct wholly-owned subsidiary of NRG.

74. GenOn's Board has unanimously approved the Merger Agreement. The Proposed Transaction is expected to close in the first quarter of 2013, subject to customary closing conditions and regulatory approvals, including the approval of the shareholders of both GenOn and NRG, the Federal Energy Regulatory Commission (FERC), the New York Public Service Commission and the Public Utility Commission of Texas.

75. On July 22, 2012, NRG and GenOn issued a joint press release announcing the Proposed Transaction. In relevant part, the press release states:

> **PRINCETON, NJ and HOUSTON, TX; July 22, 2012** — NRG Energy, Inc. (NYSE: NRG) and GenOn Energy, Inc. (NYSE: GEN) today announced they have signed a definitive agreement to combine the two companies in a stock-for-stock tax-free transaction, creating the largest competitive generator in the United States with a diverse fleet of approximately 47,000 megawatts (MW) with asset concentrations in the East, Gulf Coast and West and a combined enterprise value of $18 billion.
>
> "This combination ushers in a new era of scale, scope, and market and fuel diversification in the competitive power industry," said NRG President and CEO David Crane, who will continue his present positions with the combined company. "The greater depth and breadth gained through the combination with GenOn will put NRG in a uniquely strong position to fulfill the needs of American energy consumers in the 21st century."
>
> The transaction will enhance annual combined company EBITDA by $200 million by 2014 by realizing cost and operational efficiency synergies. In addition, the transaction will enable the combined company to reduce its interest and liquidity costs, and realize other balance sheet efficiencies, in aggregate, of $100 million per year. As a result, total recurring FCF benefits generated by this transaction will be approximately $300 million per year.
>
> "This combination will deliver immediate value to the shareholders of both companies who will benefit from the combined company's merger synergies, balance sheet efficiencies, increased scale and additional geographic diversity," said GenOn Chairman and CEO, Edward R. Muller, who will join the NRG Board of Directors as Vice Chairman. "NRG and GenOn are a great fit geographically and operationally and we look forward to working together to capture efficiencies from the scale associated with the transaction to deliver enhanced value to our investors."

**Strategic & Financial Benefits**

- **Diversification and scale**

The combined company, which will retain the name NRG Energy, will become the largest competitive power generation company in America with approximately 47,000 MW of fossil fuel, nuclear, solar and wind capacity across the merit order, situated almost entirely in the three premier competitive energy markets in the U.S. The combined fleet generates more than 104 terawatt-hours (TWh) of electricity annually.

- **Expected Synergies**

Transaction benefits will result in at least $200 million per year in incremental EBITDA and, combined with $100 million of balance sheet efficiencies, will result in at least $300 million of additional FCF by 2014, the first full year of combined operations. The $200 million per year breaks down into $175 million per year in cost synergies, principally resulting from reduced G&A expenses, and $25 million per year of operational efficiency synergies under NRG's FORNRG program. In addition, as a result of interest savings and reduced liquidity and collateral requirements, the combined company will realize an additional $100 million in reduced interest expense and collateral benefits. The transaction costs and total cash "cost to achieve" the synergies and other cash flow benefits will primarily be incurred during 2013 and are estimated at approximately $200 million.

- **Immediately and substantially accretive**

The transaction will be immediately accretive on an EBITDA basis and substantially accretive in 2014, the first full year of operation, to both EBITDA and FCF before growth investments.

- **Enables expanded wholesale-retail model**

An expanded core generation fleet will enable the combined company to duplicate in multiple core markets (principally in the East) NRG's successful integrated wholesale-retail business model in ERCOT—the best business model across the price cycle, in an industry that is subject to commodity price volatility.

- **Dividend**

This transaction will reinforce the ability to pay the 9 cents per share quarterly dividend (36 cents per share on an annual basis) previously announced by NRG for the benefit of both companies' shareholders.

- **Balance sheet and credit metric enhancing**

Balance sheets efficiencies will permit the combined company to reduce indebtedness by at least $1 billion and enhancements to corporate EBITDA and funds from operations (FFO) significantly improve key credit metrics, including:

| | 2014 NRG Standalone (1) | | 2014 NRG Pro Forma (1) | |
|---|---|---|---|---|
| Corporate Debt/Corporate EBITDA | 4.6x | | 4.1x | |
| Corporate FFO/Corporate Debt | 13.9 | % | 16.4 | % |

(1) NRG metrics are based on midpoint of guidance and pro forma metrics reflects impact of transaction benefits.

- **Cleaner energy**

The combined company will continue the work of NRG and GenOn in reducing emissions from their existing conventional fleets. NRG and GenOn combined have invested over $3 billion since 2000 to reduce emissions. This investment has helped NRG reduce $SO2$ emissions by 56% and $NOx$ emissions by 64% below 2000 levels and GenOn reduce $SO2$ emissions by 90% and $NOx$ emissions by 78% below 1990 levels.

In addition, the combined company will continue to grow NRG's industry-leading portfolio of solar generating facilities, its eVgo electric vehicle charging network and its other clean energy products and services. In addition, all previously announced plant retirements and deactivations will be completed on schedule.

**Financial Terms**

GenOn shareholders will receive 0.1216 of a share of NRG common stock in exchange for each GenOn share of common stock. Based on NRG's and GenOn's closing share prices on July 20, the transaction represents a 20.6% premium to GenOn's shareholders.

Following completion of the transaction, NRG shareholders will own 71% of the combined company and GenOn shareholders will own 29%.

**Financial Summary**

NRG is also announcing preliminary forward pro forma financial guidance for the combined company for 2013 and 2014. This includes:

|                                  | 2013                  | 2014                  |
|----------------------------------|-----------------------|-----------------------|
| Adjusted EBITDA                  | $2,535-$2,735 million | $2,630-$2,830 milllion |
| Free Cash Flow *before investments | $825-$1,025 million  | $845-$1,045 million   |

The above pro forma financial guidance includes updated guidance for GenOn as follows:

- 2013 adjusted EBITDA guidance raised from $669 million to $687 million

- 2014 adjusted EBITDA guidance provided of $730 million

Additionally, GenOn announced today that it is raising its full year guidance for 2012 adjusted EBITDA from $446 to $467 million.

**Board Structure, Management and Headquarters**

After closing, the Board of Directors will have 16 members with 12 members from the NRG Board and four joining from the GenOn Board. Howard Cosgrove will remain Chairman of the NRG Board and GenOn Chairman and CEO Edward R. Muller will join the NRG Board as Vice Chairman.

In addition to David Crane continuing to serve as Director, President and CEO, Kirk Andrews will remain as Chief Financial Officer and Mauricio Gutierrez will serve as Chief Operating Officer of the combined company. Anne Cleary of GenOn will become the Chief Integration Officer of NRG at closing.

John Ragan and Lee Davis, both currently of NRG, will act as Regional Presidents of the Gulf Coast and East regions, respectively, and John Chillemi of GenOn will become Regional President of the West region, at which time Tom Doyle will focus his efforts as President of NRG Solar.

The combined company will be dual headquartered, with financial and commercial headquarters in Princeton and operational headquarters in Houston.

76.     While the press release announcing the Proposed Transaction suggests that the premium provided under the Merger Agreement is generous, NRG's offer of approximately $2.19 per share (based on the closing price of NRG stock on July 20, 2012 the last day before the deal was announced) does not adequately reflect GenOn's true worth as a takeover candidate.

77.     As indicated in the Company's recent financial results and in management's recent comments, GenOn is positioned for long-term growth.  The inadequate consideration agreed to in the Proposed Transaction calls into question the effectiveness of the Individual

Defendants in securing a transaction that adequately captures the true value of the Company for its shareholders.

78.     Prior to the announcement of the Proposed Transaction, at least two analysts set the price target for GenOn stock at or above $4.00 per share.  Brandon Blossman, an analyst at Tudor Pickering & Co. set the price target at $4.50 per share.  On July 20, 2012, a few days before the deal's announcement, Brian J. Russo, an analyst at Ladenburg Thalmann & Co., set GenOn's stock price target at $4.00 per share.

79.     Moreover, despite agreeing to a stock-for-stock deal, the Board agreed to a fixed exchange ratio rather than negotiate a collar provision to protect GenOn shareholders in the event that NRG's share price plummets or GenOn's share price surges.

**Defendants' Deficient Disclosures**

80.     On August 15, 2012, NRG filed a materially misleading Preliminary Proxy with the SEC in connection with the Proposed Transaction.  The Preliminary Proxy fails to provide the Company's public shareholders with material information and/or provides them with materially misleading information, thereby rendering the shareholders unable to make an informed decision regarding whether or not to vote in support of the Proposed Transaction.

81.     Specifically, as discussed below, the Preliminary Proxy fails to disclose certain projections, key inputs and multiples relied upon and observed by the Company's financial advisor, JP Morgan, and NRG's financial advisors, Credit Suisse and Morgan Stanley, so that shareholders can properly assess the credibility of the various analyses performed by the advisors, particularly JP Morgan's opinion, which was relied upon by the Board in recommending the Proposed Transaction.

### *JP Morgan's Opinion*

82.     With respect to JP Morgan's *Discounted Cash Flow ("DCF") Analysis* of GenOn, the Preliminary Proxy fails to disclose the following material facts:

      (a)     Whether JP Morgan treated stock-based compensation as a cash or non-cash expense;

      (b)     The individual implied present values of GenOn's: (i) unlevered cash flows and terminal value, (ii) environmental capital expenditures for the years 2018 through 2021; (iii) out-of-the-money gas transportation contracts; (iv) potential net operating losses ("NOLs") and other tax benefits; and (iv) operating leases;

      (c)     JP Morgan's basis for selecting the range of terminal value multiples of 7.5x to 8.5x to GenOn's estimated terminal year Open EBITDAR, which value was used by JP Morgan to calculate the range of terminal values for GenOn; and

      (d)     The inputs and assumptions used by JP Morgan to derive the range of discount rates of 8.5% to 9.5%.

83.     With respect to JP Morgan's *DCF Analysis* of NRG's "generation" business unit, the Preliminary Proxy fails to disclose the following material facts:

      (a)     The range of implied present values of NRG's generation business unit;

      (b)     JP Morgan's basis for selecting the range of terminal value multiples of 7.5x to 8.5x to NRG's estimated terminal year Open EBITDAR, which was used by JP Morgan to calculate the range of terminal values for NRG's generation business unit; and

      (c)     The inputs and assumptions used by JP Morgan to derive the range of discount rates of 7.5% to 8.5% used to value NRG's generation business unit.

84.     With respect to JP Morgan's *DCF Analysis* of NRG's "retail" business unit, the Preliminary Proxy fails to disclose the following material facts:

(a)     The range of implied present values of NRG's retail business unit; and

(b)     JP Morgan's basis for selecting the range of terminal value multiples of 5.5x to 6.5x to NRG's estimated terminal year Open EBITDAR, which was used by JP Morgan to calculate the range of terminal values for NRG's retail business unit; and

(c)     The inputs and assumptions used by JP Morgan to derive the range of discount rates of 8.75% to 10.25% used to value NRG's retail business unit.

85.     With respect to JP Morgan's *DCF Analysis* of NRG's "solar" business unit, the Preliminary Proxy fails to disclose the following material facts:

(a)     The range of implied present values of NRG's solar business unit;

(b)     The inputs and assumptions used by JP Morgan to derive the range of discount rates of 8.5% to 9.5% used to value NRG's solar business unit.

86.     With respect to JP Morgan's *DCF Analysis* of NRG's consolidated business, the Preliminary Proxy fails to disclose the following material facts:

(a)     The net present value of NRG's (i) estimated 2017 environmental capital expenditures; (ii) certain recoveries of capital expenditures from co-ops after 2016 net of taxes; and (iii) net operating loss carryforwards; and

(b)     Whether JP Morgan treated stock-based compensation in this Analysis as a cash or non-cash expense.

87.     With respect to the *Other Factors* considered by JP Morgan in its opinion to the Board, the Preliminary Proxy fails to disclose the following material facts:

(a)     The Enterprise Value / LTM Adjusted EBITDA multiples for each of the eight precedent transactions selected by JP Morgan in that analysis; and

(b)     The selected financial metrics and the specific contributions of value to the combined company that was considered by JP Morgan in its opinion.

88.     The Preliminary Proxy also fails to disclose the services JP Morgan or its affiliates is currently providing to each of the parties to the Proposed Transaction, or any of their respective affiliates, and the amount of the compensation received or expected to be received by JP Morgan for services rendered or being rendered.

89.     The Preliminary Proxy further fails to disclose the services rendered by JP Morgan or its affiliates to each of the parties to the Proposed Transaction, or any of their respective affiliates, in the two years prior to being retained by GenOn, and the compensation received or expected to be received by JP Morgan for the services rendered.

### *Credit Suisse's Opinion*

90.     With respect to Credit Suisse's *Selected Companies Analyses*, the Preliminary Proxy fails to disclose the following material facts:

(a)     The following multiples for each of the comparable companies selected by Credit Suisse in the Analyses: (i) Enterprise Value / CY2012E EBITDA; (ii) Enterprise Value / CY2013E EBITDA; and (iii) Enterprise Value / CY2014E EBITDA;

(b)     The respective individual ranges of implied equity value per share from application of the multiples for years 2012, 2013 and 2014, derived by Credit Suisse for GenOn and NRG, respectively, with regard to its Analysis of each company; and

(c)     How, if at all, Credit Suisse accounted for the value of the NOLs of GenOn and NRG, respectively, in performing its Analysis of each company.

91.     With respect to Credit Suisse's *Selected Transactions Analysis*, the Preliminary Proxy fails to disclose the following material facts:

(a)     The Enterprise Value / LTM EBITDA multiples for each of the comparable precedent transactions selected by Credit Suisse; and

(b)     How, if at all, Credit Suisse accounted for the value of the Company's NOLs.

92.     With respect to Credit Suisse's *DCF Analysis* of NRG, the Preliminary Proxy fails to disclose the following material facts:

(a)     The definition of unlevered free cash flow;

(b)     Whether Credit Suisse treated stock-based compensation as a cash or non-cash expense;

(c)     The individual implied present values of NRG's: (i) unlevered cash flows and terminal value, (ii) net operating loss carryforwards and other tax benefits; and (iii) levered cash distributions and potential tax benefits that the Company's solar business was forecasted to generate during fiscal years ending December 31, 2013, through December 31, 2044;

(d)     The inputs and assumptions used by Credit Suisse to derive the range of discount rates of 7.0% to 8.5%; and

(e)     The inputs and assumptions used by Credit Suisse to derive the range of discount rates of 14.0% to 16.0% used to value NRG's solar business.

93.     With respect to Credit Suisse's *DCF Analysis* of GenOn, the Preliminary Proxy fails to disclose the following material facts:

(a)     The definition of unlevered free cash flow;

(b)      Whether Credit Suisse treated stock-based compensation as a cash or non-cash expense;

(c)      The individual implied present values of GenOn's: (i) unlevered cash flows and terminal value, (ii) environmental capital expenditures; (iii) potential NOLs and other tax benefits; and (iv) operating leases; and

(d)      The inputs and assumptions used by Credit Suisse to derive the range of discount rates of 8.5% to 9.5%.

94.      The Preliminary Proxy also fails to disclose the services Credit Suisse or its affiliates is currently providing to each of the parties to the Proposed Transaction, or any of their respective affiliates, and the amount of the compensation received or expected to be received by Credit Suisse for services rendered or being rendered.

95.      The Preliminary Proxy further fails to disclose the services rendered by Credit Suisse or its affiliates to each of the parties to the Proposed Transaction, or any of their respective affiliates, in the two years prior to being retained by NRG, and the compensation received or expected to be received by Credit Suisse for the services rendered.

### *Morgan Stanley's Opinion*

96.      With respect to Morgan Stanley's *Selected Public Companies Analyses*, the Preliminary Proxy fails to disclose how, if at all, Morgan Stanley accounted for the value of GenOn's and NRG's respective NOLs in performing its Analysis of each company.

97.      With respect to Morgan Stanley's *Selected Precedent Transactions Analysis and Premiums Paid*, the Preliminary Proxy fails to disclose the following material facts:

(a)     The following multiples for each of the comparable companies selected by Morgan Stanley: (i) Aggregate Value / FY+1 Adjusted EBITDA; and (ii) Aggregate Value / FY+2 Adjusted EBITDA;

(b)     Whether Morgan Stanley selected and applied multiples to GenOn's calendar year 2014 estimated adjusted EBITDA; and

(c)     How, if at all, Morgan Stanley accounted for the value of the Company's NOLs.

98.     With respect to Morgan Stanley's *DCF Analysis* of NRG, the Preliminary Proxy fails to disclose the following material facts:

(a)     The definition of unlevered free cash flow;

(b)     Whether Morgan Stanley treated stock-based compensation i as a cash or non-cash expense;

(c)     The individual implied present values of NRG's: (i) unlevered cash flows and terminal value, (ii) net operating loss carryforwards and other tax benefits; and (iii) levered cash distributions and potential tax benefits that the Company's solar business;

(d)     The inputs and assumptions used by Morgan Stanley to derive the range of discount rates of 7.0% to 8.5%; and

(e)     The inputs and assumptions used by Morgan Stanley to derive the discount rate of 15.0% used to value NRG's solar business.

99.     With respect to Morgan Stanley's *DCF Analysis* of GenOn, the Preliminary Proxy fails to disclose the following material facts:

(a)     The definition of unlevered free cash flow;

(b)     Whether Morgan Stanley treated stock-based compensation as a cash or non-cash expense;

(c)     The individual implied present values of GenOn's: (i) unlevered cash flows and terminal value, and (ii) net operating loss carryforwards and other tax benefits; and

(d)     The inputs and assumptions used by Morgan Stanley to derive the range of discount rates of 8.5% to 9.5%.

100.    The Preliminary Proxy also fails to disclose the services Morgan Stanley or its affiliates is currently providing to each of the parties to the Proposed Transaction, or any of their respective affiliates, and the amount of the compensation received or expected to be received by Morgan Stanley for services rendered or being rendered.

101.    The Preliminary Proxy further fails to disclose the services rendered by Morgan Stanley or its affiliates to each of the parties to the Proposed Transaction, or any of their respective affiliates, in the two years prior to being retained by NRG, and the compensation received or expected to be received by Morgan Stanley for the services rendered.

### ***NRG Management's Financial Forecasts***

102.    With regard to the financial projections provided by NRG's management to and relied upon by Credit Suisse and Morgan Stanley in connection with their respective analyses, the Preliminary Proxy fails to disclose the following material items for fiscal years 2013 through 2016 (unless otherwise indicated):

(a)     Revenue, on a consolidated basis, as well as for each of NRG's three business units (generation, retail, and solar);

(b)     Adjusted EBITDA for each of NRG's three business units;

(c)     EBIT (or D&A) for each of NRG's three business units;

(d)     Taxes (or tax rate);

(e)     Stock-based compensation expense;

(f)     Changes in net working capital for each of NRG's three business units;

(g)     Capital expenditures for each of NRG's three business units;

(h)     Unlevered free cash flow for each of NRG's three business units;

(i)     Environmental capital expenditures;

(j)     NOLs and other tax benefits; and

(k)     Levered cash distributions and potential tax benefits from the Company's solar business (through 2044).

103.    With regard to the financial projections provided by NRG's management to and adjusted by GenOn, and relied upon by GenOn's financial advisor, JP Morgan, in connection with its analyses, the Preliminary Proxy fails to disclose the following material items for fiscal years 2013 through 2016 (unless otherwise indicated):

(a)     Revenue, on a consolidated basis, as well as for each of NRG's three business units;

(b)     Adjusted EBITDA for each of NRG's three business units;

(c)     EBIT (or D&A) for each of NRG's three business units;

(d)     Taxes (or tax rate);

(e)     Stock-based compensation expense;

(f)     Changes in net working capital for each of NRG's three business units;

(g)     Capital expenditures for each of NRG's three business units;

(h)     Unlevered free cash flow for each of NRG's three business units;

       (i)      Environmental capital expenditures;

       (j)      NOLs and other tax benefits; and

       (k)      Levered cash distributions and potential tax benefits from the Company's solar business (through 2044).

### *GenOn Management's Financial Forecasts*

104.    With regard to the financial projections provided by GenOn's management to and relied upon by JP Morgan in connection with its analyses, the Preliminary Proxy fails to disclose the following material items for fiscal years 2013 through 2016:

       (a)      Revenue;

       (b)      EBIT (or D&A);

       (c)      Stock-based compensation expense;

       (d)      Changes in net working capital;

       (e)      Unlevered free cash flow;

       (f)      Environmental capital expenditures;

       (g)      NOLs and other tax benefits;

       (h)      Out-of-the-money gas transportation contracts; and

       (i)      Operating leases.

105.    With regard to the financial projections provided by GenOn's management to and adjusted by NRG, and relied upon by NRG's advisors, Credit Suisse and Morgan Stanley, in connection with their respective analyses, the Preliminary Proxy fails to disclose the following material items for fiscal years 2013 through 2016:

       (a)      Revenue;

       (b)      EBIT (or D&A);

(c)      Stock-based compensation expense;

(d)      Changes in net working capital;

(e)      Unlevered free cash flow;

(f)      Environmental capital expenditures;

(g)      NOLs and other tax benefits;

(h)      Out-of-the-money gas transportation contracts; and

(i)      Operating leases.

### *The Sales Process and Other Deficient Disclosures*

106.    The Preliminary Proxy fails to disclose the basis for the Board's decision in March 2012 to focus on accomplishing a deal with NRG to the exclusion of all others because a business combination with NRG would be "the most realistic."   In addition, the Preliminary Proxy fails to disclose whether other potential buyers or strategic alternatives were considered by the Board prior to authorizing GenOn's management and advisors to attempt to sell the Company exclusively to NRG.

107.    The Preliminary Proxy also fails to disclose the process under which the Board determined to retain JP Morgan as its financial advisor in connection with a potential sale of the Company and whether any other financial advisors were considered.

### Coercive Nature of the Proposed Transaction

108.    The Individual Defendants have breached their fiduciary duties to the public shareholders by failing to protect newly formed GenOn and failing to protect the interests of the public shareholders from the coercive nature of the Proposed Transaction

109.    In addition to concerns regarding the consideration offered to GenOn shareholders in the Proposed Transaction, to the detriment of the Company's shareholders, the terms of the

Merger Agreement substantially favor NRG, and work to unreasonably dissuade other bidders from stepping forward with superior alternative offers.

110. The Merger Agreement includes a "Non-Solicitation" provision which impairs the ability of the GenOn Board to secure an offer that adequately captures the inherent value of the Company and adequately compensates GenOn shareholders for their ownership interest in the Company. Specifically, section 6.4(a) of the Merger Agreement expressly prohibits GenOn and its representatives from, among other things, directly or indirectly: (i) soliciting, initiating, or taking any action to encourage or facilitate the making, submission or announcement of, any inquiry, discussion, request, offer or proposal that constitutes, or is reasonably likely to lead to an alternate acquisition proposal; (ii) furnishing any non-public information regarding the Company to any person in connection with, or in response to, or which would reasonably be expected to lead to an acquisition proposal; or (iii) engaging or participating in any discussions or negotiations with any third party with respect to any acquisition proposal; or (iv) entering into any letter of intent, term sheet, or agreement relating to an acquisition proposal.

111. Moreover, even if the Company receives an unsolicited acquisition proposal, under Section 6.4(a) of the Merger Agreement, before it could respond by furnishing information or enter into discussions or negotiations with the competing bidder, the Company must first: (i) determine in good faith, after consultation with its outside legal counsel and its financial advisor that the proposal is reasonably likely to result in an acquisition proposal superior to the Proposed Transaction ("Superior Offer"); (ii) that failure to take such action would be inconsistent with the Board's fiduciary duties; (iii) enter into a confidentiality agreement with the alternate bidder; and (iv) provide to NRG with notice that it made such a good faith determination.

112.    In addition, Section 6.4(b) requires the Company to notify NRG within 24 hours, in writing, of its receipt of: (i) any acquisition proposal; (ii) inquiry or request for information in connection with an acquisition proposal, or discussions; (iii) discussions or negotiations to be entered into by the Company in connection or response to an acquisition proposal.  Moreover, such notice must include the identity of the alternate bidder, a copy of the alternate proposal and related draft agreements, a summary of material oral communications or any orally communicated acquisition proposal, and the Company must update NRG within 24 hours of any changes to any financial or other material terms in connection with any alternate acquisition proposal.

113.    Defendants have also agreed to a termination fee, which may require GenOn to pay a fee of $60 million (the "Termination Fee") to NRG in the event that, *inter alia*, GenOn accepts a superior competing proposal.

114.    In the event the Company receives an unsolicited Superior Proposal, Section 6.4(e) of the Merger Agreement prevents the Company's Board from accepting the Superior Proposal and terminating the Proposed Transaction or changing its recommendation to Company stockholders concerning the Proposed Transaction, unless, *inter alia*, the Board: (i) determines in good faith (after consultation with the financial advisor) that the proposal constitutes a Superior Offer and (after consultation with outside counsel) that the failure to do so would reasonably be expected to be inconsistent with its fiduciary duties to the stockholders of the Company; (ii) provides NRG with at least four business days prior written notice of its intent to accept a Superior Offer and terminate the Proposed Transaction in order to allow NRG to renegotiate and make a counteroffer, and if any material revisions are made to the Superior Proposal during the

four-day "Notice Period," the Company must deliver a new written notice to NRG and allow it a three-day "Notice Period"; and (iv) pays the hefty Termination Fee to NRG.

### GenOn Insiders Receive Special Benefits Not Available to the Company's Public Shareholders

115.    Each of the Individual Defendants and the Company's executive officers are conflicted and in breach of their fiduciary duties, because they will receive benefits from the Proposed Transaction not available to Plaintiff and other public shareholders of GenOn.

116.    First, section 4.3 of the Merger Agreement provides for "accelerated vesting" and an opportunity to cash out of all Company options and equity awards – *i.e.*, all options and RSUs held by directors and officers (except for those granted in 2012) will fully vest upon the consummation of the Proposed Transaction.   Thus, the Individual Defendants will receive compensation for restricted securities that would otherwise be unmarketable.

117.    For example, according to the Preliminary Proxy, as a result of the accelerated vesting of options and RSUs solely by reason of the closing of the Proposed Transaction, Defendant Muller is expected to receive approximately $1.4 million in value for these otherwise unvested options and RSUs based upon the value of NRG stock being equaled to $19.33 per share (however, these interests will likely be valued much higher as NRG stock has consistently been trading above $20.00 per share since August 10, 2012 – hitting a recent post-deal announcement high of $22.92 per share on August 21, 2012).

118.    As reflected *supra*, as part of the Proposed Transaction, Defendants agreed that Muller and three other Individual Defendants will join the NRG Board after consummation of the Proposed Transaction.   Moreover, Cleary, currently GenOn's Senior Vice Present of Asset Management is expected to join the post-merger NRG as its Chief Integration Officer, and

Gaudette, currently GenOn's Senior Vice President and Chief Commercial Officer is expected to join the post-merger NRG as its Senior Vice President, Product Development and Origination.

119.    Furthermore, upon the consummation of the Proposed Transaction, the executive officers of the Company will likely receive millions of dollars in change-in-control and golden parachute payments.  Notably, notwithstanding his expected appointment as the Vice Chairman of the post-merger NRG, Muller may receive over $15 million in "golden parachute" compensation, including the value of his unvested options and RSUs that would be subject to accelerated vesting upon qualifying termination of his employment within two years following the consummation of the Proposed Transaction.  Notably, Muller's Double-Trigger Accelerated Interests as valued at approximately $2.4 million according to the Preliminary Proxy is based upon the assumption that, at the time of conversion, the value of NRG stock will equal $19.33 per share, but the value of these interests is likely to be much higher in light of the recent trading price of NRG stock.

120.    Finally, pursuant to section 6.11 of the Merger Agreement, NRG must indemnify the Company's directors, officers, employees, among others, for a period of six years following the close of the Proposed Transaction for all liabilities or claims related to their service or employment with GenOn prior to the closing of the Proposed Transaction.  The Merger Agreement requires NRG to obtain a single premium directors' and officers' liability insurance policy ("D&O Insurance"), or "tail policy," offering coverage at least as favorable as the Company's existing D&O Insurance.

## FIRST CAUSE OF ACTION

### Violation of Section 14(a) of the Exchange Act and Rule 14a-9 Promulgated Thereunder (Brought Individually Against the Individual Defendants)

121.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

122.    Plaintiff brings this claim individually and not on behalf of the Class.

123.    Defendants have issued the Preliminary Proxy with the intention of soliciting shareholder support of the Proposed Transaction.

124.    Rule 14a-9, promulgated by the SEC pursuant to Section 14(a) of the Exchange Act provides that a proxy statement shall not contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading."  17 C.F.R. §240.14a-9.

125.    Specifically, the Preliminary Proxy violates Section 14(a) and Rule 14a-9 because it omits material facts, including those set forth above. Moreover, in the exercise of reasonable care, Defendants should have known that the Preliminary Proxy is materially misleading and omits material facts that are necessary to render them non-misleading.

126.    The misrepresentations and omissions in the Proxy are material to Plaintiff, and Plaintiff will be deprived of his entitlement to cast a fully informed vote if such misrepresentations and omissions are not corrected prior to the vote on the Proposed Transaction.

## SECOND CAUSE OF ACTION

### Violation of Section 20(a) of the Exchange Act
### (Brought Individually Against the Individual Defendants)

127.   Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

128.   Plaintiff brings this claim individually and not on behalf of the Class.

129.   The Individual Defendants acted as controlling persons of GenOn within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their positions as officers and/or directors of GenOn, and participation in and/or awareness of the Company's operations and/or intimate knowledge of the false statements contained in the Preliminary Proxy filed with the SEC, they had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiffs contend are false and misleading.

130.   Each of the Individual Defendants was provided with or had unlimited access to copies of the Preliminary Proxy and other statements alleged by Plaintiffs to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

131.   In particular, each of the Individual Defendants had direct and supervisory involvement in the operations of the Company, and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.  In addition, as the Preliminary Proxy sets forth at length, and as described herein, the Individual Defendants were all involved in negotiating, reviewing and approving the Proposed Transaction.  The Preliminary Proxy purports to describe the various issues and information that they reviewed and considered, descriptions which must have had

40

input from the Individual Defendants.  The Preliminary Proxy at issue contains the unanimous recommendation of each of the Individual Defendants to approve the Proposed Transaction. They were thus directly involved in the making of this document.

132.    By virtue of the foregoing, the Individual Defendants have violated Section 20(a) of the Exchange Act.

133.    As set forth above, the Individual Defendants had the ability to exercise control over and did control a person or persons who have each violated Section 14(a) and Rule 14a-9, by their acts and omissions as alleged herein.  By virtue of their positions as controlling persons, these Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.  As a direct and proximate result of the Individual Defendants' conduct, GenOn and its shareholders will be irreparably harmed.

### THIRD CAUSE OF ACTION

### Claim for Breach of Fiduciary Duties Against the Individual Defendants

134.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

135.    Plaintiff brings this claim on behalf of himself and the Class.

136.    By the acts, transactions and courses of conduct alleged herein, the Individual Defendants are attempting to unfairly deprive Plaintiff and other members of the Class of the true value of their investment in GenOn.

137.    By the acts, transactions and courses of conduct alleged herein, the Individual Defendants have violated their fiduciary duties by contractually preventing themselves from obtaining higher offers from other interested buyers and attempting to unfairly deprive Plaintiff and other members of the Class of the true value of their investment in GenOn.

138.    By the acts, transactions and courses of conduct alleged herein, the Individual Defendants have failed to exercise ordinary care and diligence in the exercise of their fiduciary obligations toward Plaintiff and the Class.

139.    As demonstrated by the allegations above, the Individual Defendants have breached their duties of care, loyalty, candor, good faith, and independence owed to the public shareholders of GenOn because, among other reasons, they have failed to take steps to maximize the value of GenOn and act in the best interests of its public shareholders and/or are attempting to improperly put their personal interests ahead of the interests of GenOn shareholders.

140.    As a result of the actions of the Individual Defendants, Plaintiff and the Class will suffer irreparable injury in that they will not receive their fair portion of the value of GenOn's assets and businesses and will be prevented from obtaining fair value for their investment.

141.    The Individual Defendants have capitulated to NRG's self-serving importuning and are not acting in good faith toward Plaintiff and the other members of the Class.  Unless the Individual Defendants are enjoined by the Court, they will continue to breach their fiduciary duties owed to Plaintiff and the members of the Class, to the irreparable harm of the members of the Class.

142.    Plaintiff and the other Class members have no adequate remedy at law.  Only through the exercise of this Court's equitable powers can Plaintiff and the Class be fully protected from the immediate and irreparable injury which the Individual Defendants' actions threaten to inflict.

## FOURTH CAUSE OF ACTION

### Claim for Breach of Candor Against the Individual Defendants

143.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

144.    Plaintiff brings this claim on behalf of himself and the Class.

145.    The fiduciary duties of the Individual Defendants in the circumstances of the Proposed Transaction require them to disclose to Plaintiff and the Class all information material to the decisions confronting GenOn's shareholders.

146.    As set forth above, the Individual Defendants have breached their fiduciary duty through materially inadequate disclosures and material disclosure omissions.

147.    As a result, Plaintiff and the other Class members are being irreparably harmed.

148.    Plaintiff and the other Class members have no adequate remedy at law.

## FIFTH CAUSE OF ACTION

### Claim for Aiding and Abetting Against All Defendants

149.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

150.    Plaintiff brings this claim on behalf of himself and the Class.

151.    Defendants have acted and are acting with knowledge of, or with reckless disregard to, the fact that the Individual Defendants are in breach of their fiduciary duties to GenOn's public shareholders, and have participated in such breaches of fiduciary duties.

152.    Defendants have knowingly aided and abetted the Individual Defendants' wrongdoing alleged herein.  In so doing, Defendants rendered substantial assistance in order to effectuate the Merger Agreement in breach of the Individual Defendants' fiduciary duties.

153.    Plaintiff and the other Class members have no adequate remedy at law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment as follows:

A.      Declaring this action to be a proper class action and certifying Plaintiff as Class representative and Plaintiff's counsel as Class counsel;

B.      Declaring that the Preliminary Proxy is materially misleading and contains omissions of material fact in violation of Section 14(a) of the Exchange Act and Rule 14a-9 promulgated thereunder;

C.      Declaring that Defendants have breached their fiduciary duties, or aided and abetted such breach, to Plaintiff and the Class;

D.      Declaring that the Merger Agreement and Proposed Transaction were entered in breach of Defendants' fiduciary duties and is therefore unlawful and unenforceable;

E.      Preliminarily and permanently enjoining Defendants and all those acting in concert with them from consummating the Proposed Transaction unless the Company makes full and necessary disclosure to GenOn public shareholders and until such time, as any, that the Individual Defendants have adequately undertaken all appropriate and available methods to maximize shareholder value;

F.      In the event that the Proposed Transaction is consummated, rescinding it or awarding actual and punitive damages to Plaintiff and the Class;

G.      Awarding Plaintiff his fees and expenses in connection with this litigation, including reasonable attorneys' and experts' fees and expenses;

H.      Granting a trial by jury on all claims; and

I.      Granting such other and further relief as the Court deems just and proper.

Dated:  September 5, 2012.

                                        Respectfully submitted,


                                        _____/s/ Thomas E. Bilek_____
                                        Thomas E. Bilek
                                        State Bar No. 02313525 / SDTX Bar No. 9338
                                        **THE BILEK LAW FIRM, L.L.P.**
                                        808 Travis, Suite 802
                                        Houston, TX  77002
                                        (713) 227-7720
                                        FAX (713) 227-9404

                                        *Attorneys for Plaintiff*

OF COUNSEL:

Joseph H. Weiss*
Julia J. Sun*
Joshua M. Rubin*
**WEISS LAW L.L.P.**
1500 Broadway, 16th Floor
New York, NY  10036
Tel:  (212) 682-3025
Fax:  (212) 682-3010
*Pro Hac Vice admission to be sought.




                        CERTIFICATE OF SERVICE


        I certify that a true and correct copy of the foregoing was filed via the Live District
CM/ECF System on September 5, 2012, which caused an electronic copy of same to be served
automatically upon counsel of record.


                                        _____/s/ Thomas E. Bilek_____
                                        Thomas E. Bilek


                                            45